Eugene Y. Turin (SBN 342413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

*Counsel for Plaintiff and the Putative Class Members*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDY MARTINEZ, individually and on behalf of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA d/b/a Labcorp, a Delaware corporation,<br><br>Defendant. | Case No. 22-cv-00631-MMA-WVG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. **Violation of California Consumer Legal Remedies Act, California Civil Code § 1750,** *et seq.*<br>2. **Unjust Enrichment**<br>3. **Violation of California False Advertising Law, Business & Professions Code § 17500,** *et seq.*<br><br>Hon. Michael M. Anello<br><br>DEMAND FOR JURY TRIAL |

# FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Sandy Martinez ("Plaintiff"), by and through her undersigned counsel, brings this First Amended Class Action Complaint against Laboratory Corporation of America d/b/a Labcorp ("Labcorp" or "Defendant"), on behalf of herself and all others similarly situated, and alleges upon personal knowledge as to her own actions, and upon information and belief as to counsel's investigations and all other matters, as follows:

## NATURE OF THE CASE

1. This is an action brought by Plaintiff on her own behalf and on behalf of other similarly situated individuals for the unlawful, deceptive, and misleading trade practices engaged in by Defendant, who operates one of the largest clinical laboratory testing networks in the world. Plaintiff seeks to represent a Class of individuals who purchased Defendant's non-invasive prenatal test (NIPT).

2. NIPTs, such as Defendant's MaterniT 21 Plus test ("MaternitT 21"), are blood drawn tests for pregnant women that can screen for certain chromosomal abnormalities that could affect a baby's health and development. These disorders include Down syndrome, Turner syndrome, and many other serious conditions that can be detrimental to a baby's health. While NIPT is one of many forms of prenatal testing, companies, such as Defendant, have capitalized on technological advances in noninvasive prenatal testing to offer a product to expecting mothers that is affordable and purportedly accurate.

3. Specifically, traditionally parents could only screen for genetic conditions only later in the pregnancy through invasive procedures such as amniocentesis that required a needle to be inserted through the stomach and piercing the amniotic sac surrounding the baby to draw blood directly from the fluid surrounding the baby. These procedures invariably carried a very small, but existent risk of miscarriage. NIPTs have been marketed and heralded as a solution to the

trade-off between knowing if a baby has a severe genetic abnormality and the risk of miscarriage by testing the small amount of the baby's genetic material that is present in the mother's blood without having to draw directly from the amniotic fluid of the baby.

4. However, despite these representations, an investigation by the New York Times recently revealed that positive tests results from NIPTs for some genetic conditions are incorrect about 85 percent of the time, or more, producing a high frequency of false positive results from NIPTs.

5. False positive results in prenatal testing carry severe consequences. Many times, expecting parents, and specifically pregnant mothers, are subject to invasive diagnostic prenatal testing and significant additional medical diagnosis and care as their pregnancy may be labeled as a "high risk" pregnancy. This is not to mention the severe anxiety and stress about the health of their child that false positive NIPT results cause soon-to-be parents.

6. Defendant is one of the largest providers of NIPT testing and represents that its MaterniT 21 NIPT test is an accurate and non-invasive means to test for genetic abnormalities during pregnancy even though its MaterniT 21 test also has very high rates of false positives. In addition, even though NIPTs are meant to be screening tests only that lack the same precision as more invasive genetic testing such as that which is performed by amniocentesis, Defendant fails to inform the patients who order its MaterniT 21 test prior to taking the test that they need to undergo genetic counseling before and after the test to understand the results and their predictive value, and that the test is meant to be a screening test only that may be susceptible to high rates of false positive.

7. As such, Defendant's customers are misled into purchasing its genetic tests under a false or at best incomplete understanding of what it provides such that

Plaintiff and the other members of the putative class she seeks to represent would not have purchased Defendant's testing services, or would have paid less for them.

8. Plaintiff brings this class action lawsuit on behalf of herself and all other similarly situated individuals and seeks damages, restitution, declaratory and injunctive relief.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), consisting of over 100 members of all proposed classes in which at least one member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

10. This Court has personal jurisdiction over Defendant because it advertised, marketed, distributed and sold the MaterniT 21 NIPT test at issue within the State of California; Defendant engaged in the wrongdoing alleged in this Complaint in the State of California; Defendant is authorized to do business in the State of California; and Defendant has sufficient minimal contacts with the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial commercial activity within the State of California.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within this judicial District; Defendant marketed and sold the MaterniT 21 NIPT test at issue in this action in this District, including to Plaintiff; and Defendant conducts business within this District.

# PARTIES

12. Plaintiff Sandy Martinez is a natural person and resident of Riverside, California.

13. Defendant Laboratory Corporation of America is a Delaware corporation with its headquarters located in Burlington, North Carolina, and has regularly engaged in business throughout the state of California. Upon information and belief, Defendant directs the marketing and sale of its MaterniT 21 NIPT test to consumers throughout the United States, including in California.

# COMMON FACTUAL ALLEGATIONS

14. Prenatal testing has been used for decades to help identify during the pregnancy whether the fetus is more or less likely to have any birth defects as a result of any genetic disorders.

15. Prenatal testing provides valuable information to expecting mothers in aiding their decision whether or not to continue the pregnancy in light of the risks associated with any particular genetic disorder.

16. Given that extremely valuable information that prenatal testing can provide, the market for prenatal tests is enormous, with estimates in the range of $600 million to $1 billion.[1]

17. Prenatal testing exists both in the form of diagnostic testing and screening testing. Traditionally, prenatal testing was only available primarily as an invasive diagnostic test that involved amniocentesis, a procedure where a needle is inserted through the stomach and into the amniotic sac surrounding the baby to draw a sample of the amniotic fluid surrounding the baby that contains the baby's genetic material. While amniocentesis is very accurate because it draws genetic material directly from the baby, it carries a small, but not non-existent risk of miscarriage due to its invasive nature.

---

[1] https://nytimes.com/2022/01/01/upshot/pregnancy-birth-genetic-testing.html.

18. In the past decade, medical technology companies have invented non-invasive prenatal testing (NIPT) which instead of using amniotic fluid directly from the uterus, relies on a simple regular blood sample taken from the mother which is then screened for pieces of the baby's genetic material that freely circulates in the mother's blood stream. Unlike traditional amniocentesis, NIPT carries no risk of miscarriage to the baby because it relies on a regular blood draw, rather than a needle being inserted into the amniotic sac that the baby is within.

19. Given that NIPT testing can be safely performed without any risks it has attracted significant interest. However, unbeknownst to the vast majority of patients who choose to use NIPT testing, NIPT testing can be far less accurate than other prenatal diagnostic tests because NIPT is able to evaluate only the small pieces of the baby's DNA that happen to make their way into the mother's bloodstream rather than looking at the baby's DNA directly.

20. Recently, in January 2022, a New York Times investigation reported on the accuracy of NIPT. That published investigation reported that NIPT screening for rare chromosomal disorders inaccurately report a false-positive result approximately 85% of the time.[2] And even for more common chromosomal disorders such as Turner's syndrome they can give false positive results as much as 74% of the time.

21. Further, the report investigated companies offering NIPT, such as Defendant, and the fact that they misrepresent the accuracy of their tests. "The Times reviewed 17 patient and doctor brochures from eight of the testing companies, including . . . Labcorp . . . Ten of the brochures never mentioned that a false positive can happen. Only one mentioned how often each test gets positive results wrong."[3]

22. Surprisingly, the Food and Drug Administration does not regulate NIPT screening exams. Thus, patients and doctors are highly susceptible to be deceived by misrepresentations made by companies that sell NIPT tests.

---

[2] *Id.*
[3] *Id.*

5

**FIRST AMENDED CLASS ACTION COMPLAINT**                              Case No. 22-cv-00631

23. False positive test results from NIPT testing have extreme consequences to the patient and consumers that are relying on the results. For example, parents can be led to fear that their pregnancy carries high risk for the unborn child to be born with significant health problems, causing severe anxiety to the parents. Economic consequences can be significant including paying for further genetic testing and paying for doctors that specialize in prenatal screening. As reported by the Times, "Patients who receive a positive result are supposed to pursue follow-up testing, which often requires a drawing of amniotic fluid or a sample of placental tissue. Those tests can cost thousands of dollars, come with a small risk of miscarriage and can't be performed until later in pregnancy- in some states, past the point where abortions are legal."[4] Further, in some instances patients even choose to terminate their pregnancy based on the false positive results of an NIPT.

24. Defendant is one of the largest providers of NIPT tests with its MaterniT21 NIPT test that is used by thousands of patients throughout California, and the country.

25. Defendant markets its MaterniT21 test as a more clinically complete solution than other NIPTs on the market.[5] Defendant boasts its comprehensive screening panel, high reportable results rate, and low frequency of patient blood redraws that may result from not obtaining enough fetal genetic material.[6]

26. Defendant also advertises that its MaterniT 21 test is highly accurate. Specifically, Defendant represents that its NIPT provides patients with "more information earlier in [the] pregnancy" by screening for chromosomal abnormalities which have profound health consequences in the life and health of the parent's child.[7] Defendant also states that its MaterniT 21 test has higher detection rates than serum

---

[4] *Id.*
[5] https://womenshealth.labcorp.com/sites/default/files/2021-10/rep-1035-v5-1019.pdf
[6] *Id.*
[7] *Id.*

6

**FIRST AMENDED CLASS ACTION COMPLAINT**  Case No. 22-cv-00631

screening, which has a 97.9% positive predictive value for trisomy 21.[8] Further, Defendant states that its MaterniT21 test "delivers clear positive or negative results for well-known chromosomal abnormalities, such as trisomy 21 (Down syndrome)."[9]

27. Defendant markets and advertises that its MaterniT 21 test can accurately detect the following chromosomal abnormalities: Trisomy 21, Trisomy 18, Trisomy 13, Trisomy 16, Trisomy 22, 45 X (Turner Syndrome), 47 XXY, 47 XXX, 47 XYY, 22q, 5p, 1p36, 15q, 11q, 8q, and 4p all representing various health risks for unborn children.[10]

28. Defendant however fails to disclose to patients that its MaterniT 21 test returns a high frequency of false positive results. In fact, Defendant specifically states that most women will screen negative for chromosomal abnormalities and will not require further testing without mentioning overwhelmingly likelihood that any positive result is wrong.[11]

29. Just one of many examples of the consequences of Defendant's failure to accurately market its MaterniT 21 test and provide patients with sufficient information before providing them results is what occurred to Plaintiff during her pregnancy.

30. In May 2020 Plaintiff was informed by her healthcare provider that she had the option of taking Defendant's MaterniT 21 test to find out if her baby had any potential genetic abnormalities.

31. Believing that Defendant's MaterniT 21 test was an accurate way to test for any genetic abnormalities, and having no knowledge about the extremely high rate of false positives that it generates, Plaintiff decided to have Defendant's MaterniT 21 test performed.

---

[8] www.labcorp.com/pregnancy/maternit21-plus
[9] *Id.*
[10] *Id.*
[11] *Id.*

32. However, prior to ever receiving her test report from Defendant, Plaintiff was contacted by her doctor and informed that her baby had tested positive for Turner syndrome. Turner syndrome is a serious genetic disorder that causes a range of medical issues including short height, heart abnormalities, and lack of formation of reproductive organs. Plaintiff was asked by her provider if she wished to continue with her pregnancy.

33. Critically, in its clinical brochure that Defendant provides to doctors to counsel their patients and advertise Defendant's Maternit 21 test, Defendant states that its Maternit 21 test has a sensitivity rate of "96.2%" for "combined sex chromosome aneuploidies", which would include Turner Syndrome, and a specificity rate of "99.7%" for such disorders. The sensitivity rate is the rate of false negatives, while the specificity rate is the rate of false positives.[12]

34. However, the study that Defendant cites to for those results, looked at the ability of Defendant's test to detect *all* sex chromosome aneuploidies, without specifically determining the false positive rate for Turner Syndrome in particular.[13]

35. Moreover, others have recognized that NIPT testing for sex chromosomal aneuploidies such as Turner Syndrome "have not been validated in large-scale studies," and that "researchers acknowledge that the positive predictive value for these conditions is low[.]"[14]

36. Indeed, one study that sought to test the predictive value of NIPT's for Turner Syndrome, including specifically Defendant's NIPT, found that a positive result for Turner Syndrome would be accurate just *9%* of the time.[15]

---

[12] Attached hereto as Exhibit A, at 8.
[13] *Noninvasive prenatal detection of sex chromosomal aneuploidies by sequencing circulating cell-free DNA from maternal plasma*. Prenat Diagn. 33: 591-597 (available at https://obgyn.onlinelibrary.wiley.com/doi/epdf/10.1002/pd.4127).
[14] www.ncbi.nlm.nih.gov/pmc/articles/PMC4993715/pdf/nihms808393.pdf.
[15] *Sex chromosome aneuploidy detection by noninvasive prenatal testing: helpful or hazardous?*. Prenat Diagn, 37: 515, 517 (attached hereto as Exhibit B).

37. It is no wonder that there are countless reports of parents who, like Plaintiff, were informed by Defendant that their child would have Turner Syndrome only to find out that it was a false positive.[16]

38. Plaintiff was never informed that Defendant's test results contain very low positive predictive value while screening for Turner syndrome and other chromosomal abnormalities.

39. Nor did Defendant take any steps to ensure that Plaintiff was fully informed before she even took its test, or before she received the results, that the test is meant to be a screening test only that has significant limitations in predictive value when it comes to any positive test result.[17]

40. Furthermore, even when Plaintiff received the actual test report, it disclosed that the test had the same sensitivity rate of "96.2%" for "Sex Chromosome Aneuploidies", and a specificity rate of "99.7%" as it disclosed in the doctor brochure, despite the fact that it is widely acknowledged by the scientific community that NIPT testing for Turner Syndrome is particularly susceptible to false positive results.

41. As a result of the false positive result, Plaintiff suffered extreme stress and anxiety regarding the health of her unborn child throughout the rest of her pregnancy and felt that the joy that she otherwise wished to experience during her first and only pregnancy was instead replaced with constant fear and numerous additional doctor's appointments.

42. Because Defendant's MaterniT 21 test is highly inaccurate in reporting positive results, Plaintiff's daughter was actually born with no abnormal health conditions, and specifically without Turner syndrome.

---

[16] https://qz.com/646436/prenatal-testing-is-about-to-make-being-pregnant-a-lot-more-stressful/; https://community.babycenter.com/post/a41617924/maternit21_-_false_positive.

[17] As the study assessing Defendant's Maternit 21 test noted, "Pretest counseling about the high false positive rate for monosomy X [Turner Syndrome] will reduce anxiety in the eventuality of a positive NIPT report." (Ex. B, at 519.)

9

**FIRST AMENDED CLASS ACTION COMPLAINT**  Case No. 22-cv-00631

43. Had Plaintiff known of the high likelihood of false positive results in Defendant's MaterniT 21 NIPT test, or that Defendant would fail to accurately report the results of the test to her and provide necessary information about the positive result that she received, she would not have agreed to take the test, or would have paid significantly less for it.

44. Plaintiff, like other members of the Class, suffered economic harm in the form of the purchase price of the test, as well as emotional distress, stress and anxiety as a result of Defendant's unreliable MaterniT 21 test.

## CLASS ALLEGATIONS

45. Plaintiff brings this action on her own behalf and on behalf of a Class and Subclass, pursuant to Cal. Code Civ. Proc. § 382, Cal. Civ. Code § 1781, and Cal. Bus. & Prof. Code § 17203, defined as follows:

The Class:

> All purchasers of Defendant's MaterinT 21 testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source.

The California Subclass:

> All persons who within the state of California purchased Defendant's MaterniT 21 testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source.

46. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Subclass (collectively, the "Class"). Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and have the financial

resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

47. **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

48. **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

49. **Typicality.** The factual and legal bases of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

50. **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members such that joinder of all members is impracticable.

51. **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to, the following:

(a) Whether Defendant's MaterniT 21 test is accurate and reliable;

(b) Whether Defendant disclosed the truth regarding the accuracy and reliability of its MaterniT 21 test;

(c) Whether Defendant's advertising and representation for its MaterniT 21 test constitutes a deceptive practice;

(d) Whether Defendant's failure to inform its customers regarding the high likelihood of a false positive test result constitutes a deceptive practice;

(e) Whether Defendant's failure to inform its customers about the limited value of any positive results from its MaterniT 21 test is a deceptive practice;

(f) Whether Defendant's failure to provide proper information about its MaterniT 21 test directly to patients is a deceptive practice;

(g) Whether Plaintiff and the other Class members were damaged by Defendant's conduct;

(h) Whether Plaintiff and the other Class members are entitled to restitution or other relief; and

(i) Whether Defendant has been unjustly enriched as a result of Defendant's conduct.

## FIRST CAUSE OF ACTION
**Public Injunctive Relief for Violations of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.
(On behalf of Plaintiff and the Subclass)**

52. Plaintiff hereby incorporates the foregoing allegations by reference as if fully restated herein.

53. Plaintiff brings this claim individually and on behalf of members of the Subclass pursuant to the Consumers Legal Remedies Act ("CLRA"), Civil Code Section 1750, *et seq*.

54. Defendant is a "person" as defined by California Civil Code § 1761(c).

55. Plaintiff and other Subclass members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased Defendant's MaterniT 21 test for personal, family, or household purposes.

56. Plaintiff and other Subclass members have engaged in "transactions" with Defendant, as is defined by Civil Code §1761(e).

57. Defendant's conduct as alleged herein occurred in the course of trade or commerce.

58. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA, and were undertaken by Defendant in transactions intended to result in, and which resulted in, the sale of goods to consumers; namely, the sale of Defendant's MaterniT 21 test by Defendant to Plaintiff and Subclass members.

59. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale of goods.

60. Specifically, the CLRA prohibits, in part:

(a)(7) representing that goods or services are of a particular standard, quality, or grade . . . if they are of another; and

(a)(9) advertising goods or services with intent not to sell them as advertised.

61. By engaging in the conduct described herein, Defendant has violated subdivision (a)(5) and (a)(9) of California Civil Code § 1770.

62. Defendant has violated the CLRA and has caused substantial injury to consumers, including Plaintiff, by its deceptive and misleading advertising and disclosures regarding the accuracy and diagnostic value of its MaterniT 21 test.

63. Pursuant to § 1782(d) of the California Civil Code, Plaintiff and the Subclass seek a court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

64. If Defendant fails to rectify or agree to rectify the violations detailed above and give notice to all affected consumers within 30 days of receipt of this notice of violations, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

## SECOND CAUSE OF ACTION
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

65. Plaintiff hereby incorporates the above allegations by reference as though fully set forth herein.

66. Plaintiff and the other Class members conferred an economic benefit on Defendant through purchases of Defendant's MaterniT 21 test.

67. It is inequitable and unjust for Defendant to retain the revenue obtained from purchases made by Plaintiff and the other Class members due to the deceptive nature of Defendant's advertisements regarding the accuracy and diagnostic value of the tests and due to Defendant's failure to provide accurate and complete information regarding the limited diagnostic value of its test directly to Plaintiff and the other Class members.

68. Accordingly, because Defendant will be unjustly enriched if it is allowed to retain such funds, Defendant must pay restitution to Plaintiff and the other Class members in the amount which Defendant was unjustly enriched by each of their test purchases.

## THIRD CAUSE OF ACTION
**Unlawful and Unfair Business Practices in Violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of Plaintiff and the Class)**

69. Plaintiff hereby incorporates the above allegations by reference as though fully set forth herein.

70. Plaintiff and Defendant are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

71. California's Unfair Competition Law, Business & Professions Code, § 17200, *et seq.* ("UCL"), prohibits deceptive acts and practices in the sale of consumer products and services, such as Defendant's above listed NIPT tests.

72. Defendant's conduct as alleged herein occurred in the course of trade or commerce.

73. Plaintiff brings this claim individually and on behalf of other persons similarly situated pursuant to the UCL.

74. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

75. Defendant's marketing and advertising regarding its MaterniT 21 test, as described herein, is deceptive, misleading, offends public policy, has caused substantial injury to consumers, including Plaintiff, and constitutes an unfair and deceptive trade practice. Defendant misrepresents the accuracy and diagnostic value of its MaterniT 21 test to consumers, making them believe the quality of the test performed has more value than it actually does. Furthermore, Defendant fails to provide accurate and complete information directly to its customers regarding the limited diagnostic value of any positive test result.

76. Defendant intended for consumers to rely on its misrepresentations and deceptive marketing regarding its MaterniT 21 test, and intended for consumers to believe that test that they were purchasing were worth more than what Plaintiff and Class members would have otherwise paid for them had they known the truth about its diagnostic value and that Defendant would fail to provide fair and complete test reports that fully explained the test's predictive value.

77. Plaintiff and the other members of the Class did reasonably rely on Defendant's misrepresentations in choosing to purchase Defendant's MaterniT 21

15
**FIRST AMENDED CLASS ACTION COMPLAINT**                            Case No. 22-cv-00631

test, and would not have purchased them had Defendant not made the false and deceptive representations regarding their accuracy and diagnostic value.

78. Further, under the UCL, a business practice is "unlawful" if it violates any established state or federal law.

79. Defendant's false and deceptive representations described above constitute violations of California's Consumer Legal Remedies Act ("CLRA"), Civil Code Section 1750, *et seq.* (as detailed above).

80. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale of goods or services.

81. Defendant's conduct constitutes unfair methods of competition and unfair or deceptive acts or practices through the misrepresentations and deceptive representations described herein this complaint, and therefore is "unlawful" under the UCL via its violation of the CLRA.

82. As a direct and proximate cause of Defendant's deceptive, unfair, and unlawful trade practices, Plaintiff and the other members of the Class suffered actual damages, including monetary losses.

83. Plaintiff and the other members of the Class are entitled damages in an amount to be proven at trial, reasonable attorney's fees, injunctive relief prohibiting Defendant's unfair, unlawful, and deceptive acts going forward, and any other penalties or awards that may be appropriate under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request, on her own behalf and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action, defining the Class and Subclass as requested herein, appointing Plaintiff as class representatives and her counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law;

3. Awarding Plaintiff reasonable attorneys' fees, costs, and other litigation expenses;

4. Awarding pre- and post-judgment interest, as allowable by law; and

5. Awarding such further and other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

DATED: June 1, 2022

Respectfully submitted,

SANDY MARTINEZ, individually and on behalf of similarly situated individuals

By: /s/ *Eugene Y. Turin*

Eugene Y. Turin (SB # 324413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

*Counsel for Plaintiff and the Putative Class Members*